# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOSEPH HARRIS,                                  Case No. 1:15-cv-189
      Petitioner,

                                       Black, J.
      vs.                                    Litkovitz, M.J.

HAMILTON COUNTY                          **REPORT AND**
SHERIFF, et al.,                              **RECOMMENDATION**
      Respondents.

Petitioner, through counsel, has filed a pretrial petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2241. (Doc. 1). This matter is before the Court on the petition,

respondents' return of writ and supplemental return of writ, and petitioner's reply. (Docs. 1, 4,

6, 7).

## I.    FACTUAL BACKGROUND

The Ohio Court of Appeals set forth the following summary of the facts that led to

petitioner's convictions and sentence:

> Gulleman was 18 years old when he drove from Indiana to Winton Terrace for the
> purpose of buying Oxycontin from Harris. Gulleman parked his car in a lot. He
> was then shot seven to eight times. He died at the scene.

(Doc. 1, Ex. 4, PageID 70).

## II.    PROCEDURAL HISTORY

### State Trial Proceedings

On October 29, 2010, the Hamilton County, Ohio grand jury returned a six-count

indictment charging petitioner with aggravated murder, murder, aggravated robbery, and three

counts of having weapons while under disability. (Doc. 1, Ex. 1). Following a jury trial,

petitioner was found guilty of all counts charged in the indictment. (Doc. 1, Ex. 2). Petitioner

received a total aggregate prison sentence of life without possibility of parole plus sixteen years

in the Ohio Department of Corrections.  (*Id.*).

### Direct Appeal

Petitioner, through counsel, filed a timely notice of appeal to the Ohio Court of Appeals.

Petitioner raised the following six assignments of error in his appellate brief:

1. The trial court erred to the prejudice of the appellant by allowing the state to introduce evidence of the appellant's court ordered competency evaluation, including statements appellant made to the court appointed psychiatrist, in violation of the Fifth Amendment protection against self incrimination, the Sixth Amendment right to counsel and the Fourteenth Amendment right to a fair trial and due process of law as guaranteed by the United States Constitution.

2. The trial court erred to the prejudice of the appellant in failing to grant his motion to compel discovery violating his right to a fair trial and due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution.

3. The state engaged in prosecutorial misconduct which deprived appellant of a fair trial and due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution.

4. Appellant was deprived of his right to effective assistance of counsel in violation of his right to a fair trial and the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments.

5. The trial court erred to the prejudice of the appellant in that it convicted him based on insufficient evidence and that it convicted him against the manifest weight of the evidence, in violation of the due process clause of the Constitution. The trial court further erred in failing to grant appellant's Rule 29 motion at the close of the state's case in chief.

6. The cumulative effect of the errors which occurred in this case deprived defendant-appellant of his right to a fair trial and due process of law in violation of the Fourteenth Amendment.

(Doc. 1, Exhibit 3, PageID 23–26).  On February 6, 2013, the Ohio Court of Appeals affirmed

the judgment of the trial court in part, reversed in part, and remanded the case to the trial court

for a new trial.  (Doc. 1, Ex. 4, PageID 67).  The Court of Appeals sustained petitioner's first

assignment of error, finding that the trial court erred when it allowed a court psychologist to

testify regarding petitioner's competency evaluation during the state's case in chief. The appeals court overruled petitioner's remaining assignments of error.

## Ohio Supreme Court

The state filed a notice of appeal and memorandum in support of jurisdiction to the Ohio Supreme Court. Petitioner, through counsel, filed a cross appeal seeking review of the Court of Appeals' decision overruling petitioner's assignment of error challenging the sufficiency of evidence. (Doc. 1, Ex. 5, PageID 84). The Ohio Supreme Court accepted for review the state's appeal, but declined to review petitioner's cross appeal. (Doc. 1, Ex. 6, PageID 102). On January 22, 2015, the Ohio Supreme Court affirmed the judgment of the Ohio Court of Appeals and remanded the case to the Hamilton County Court of Common Pleas for a retrial. (Doc. 1, Ex. 7, PageID 103).

## Federal Habeas Corpus

Petitioner, through counsel, filed the instant federal habeas corpus action on March 18, 2015. (Doc. 1). In the petition, petitioner claims that insufficient evidence was offered to support his convictions for aggravated robbery and aggravated murder. Following his initial trial, petitioner unsuccessfully challenged the sufficiency of evidence supporting his convictions in the Ohio Court of Appeals on direct appeal and in his cross appeal to the Ohio Supreme Court. As in this case, "[w]hen a state reviewing court specifically finds the evidence sufficient to support a conviction but reverses on other grounds and orders a new trial, the defendant may seek to prevent a retrial on double jeopardy grounds by bringing a federal habeas corpus proceeding after state remedies have been exhausted." *Delk v. Atkinson*, 665 F.2d 90, 93 (6th Cir. 1981). *See also Burks v. United States,* 437 U.S. 1, 18 (1978) ("the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient").

Because petitioner maintains that there was insufficient evidence to support his aggravated robbery and aggravated murder convictions, he claims that his pretrial custody and pending retrial violate his right against double jeopardy.

Respondents have filed a return of writ and supplemental return of writ in opposition to the petition. (Doc. 4, 7). According to respondents, the petition is without merit.

## III. THE PETITION SHOULD BE DENIED

In order to assess the merits of petitioner's double jeopardy claim, the Court must look to the merits of the underlying sufficiency of evidence claim. The applicable standard of review governing the adjudication of petitioner's sufficiency of the evidence claim is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412–13 (2000)). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599–600 (quoting *Williams,* 529 U.S. at

413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet.  *Id.* at 600. As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards.  *See, e.g., Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court).  It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . . .  This is a "substantially higher threshold.". . .  To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* __ U.S. __, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original).  The Supreme Court recently extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d).  *See Johnson v. Williams*, __ U.S. __, 133 S.Ct. 1088, 1091 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents."  *Harrington*, 131 S.Ct. at 786.  In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, __ U.S. __, 132 S.Ct. 38, 44–45 (2011); *cf. Otte*, 654 F.3d at 600 (citing *Lockyer v. Andrade,* 538 U.S. 63, 71–72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision"). In *Greene*, 132 U.S. at 44, the Court explained:

> [W]e held last term in *Cullen v. Pinholster*, 563 U.S. ___, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits. We said that the provision's "backward-looking language requires an examination of the state-court decision at the time it was made." *Id.*, at __, 131 S.Ct. at 1398. The reasoning of *Cullen* determines the result here. As we explained, § 2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court decisions *as of 'the time the state court renders its decision.*'" *Id.*, at __, 131 S.Ct. at 1399 (quoting *Lockyer v. Andrade,* 538 U.S. [at] 71-72 . . .; emphasis added).

Decisions by lower courts are relevant "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)). The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412).

The Ohio Court of Appeals was the only state court to issue a reasoned decision

6

addressing the merits of petitioner's assignment of error challenging the sufficiency and manifest weight of the evidence. The court rejected both claims, providing the following summary of the testimony at trial and reasoning in support of its decision:

{¶ 5} . . . Gulleman's mother, Jamie Gulleman, testified that her son had had a drug problem, and that she had identified him from a photograph shown to her by police officers.

{¶ 6} Khristina Willis testified that she had lived in Winton Terrace in February 2010. Willis stated that on the night of September 25, 2010, she had been walking to a store in the neighborhood and had seen Harris pull out a gun and ask a group of people "where the money and weed at." According to Willis, she knew Harris through his mother. Willis stated that she believed that Harris and another black male had been committing a robbery. After seeing Harris pull out a gun, Willis had run down the street to her neighbor's house. As Willis was running to her neighbor's house, she had seen Harris and the other man going toward a street known as "Long Craft." Willis estimated that she had been at her neighbor's house for approximately ten minutes when she heard shots ring out from the direction where Harris had been headed. Willis then had seen Harris and another man jumping a fence near a parking lot.

{¶ 7} Police officer Benjamin Miller testified that in the early morning hours of September 26, 2010, he had gone to a parking lot behind a building at 112 Craft Street in Cincinnati in response to a report of shots having been fired. Miller testified that 112 Craft Street was on the portion of street commonly referred to in the neighborhood as "Long Craft." According to Miller, when he and his partner responded to the parking lot, they had found a gunshot victim slumped over in the driver seat of a white, four-door sedan. Miller testified that the victim was unresponsive, and that he and his partner had called for paramedics at that time. Miller remained at the scene to ensure that no one disturbed the crime scene.

{¶ 8} Dr. William Ralston, chief deputy coroner for Hamilton County, testified about the autopsy that he performed on Gulleman. Ralston stated that Gulleman had been shot eight or nine times and that all of the bullets had traveled from right to left. Ralston stated that the results of the autopsy were consistent with the bullets having been fired from the passenger side of the car.

{¶ 9} The state next called Sherron Peoples to testify. Peoples stated that he knew both Harris and Bennie, and that he had known Harris all his life. On the night of the shooting, Peoples was in a car in the same parking lot where Gulleman was shot. Peoples testified that he had seen Gulleman pull into the parking lot in a white car. After Gulleman had parked his car, Peoples had seen Harris and Bennie walk into the parking lot and go toward Gulleman's car. During his trial testimony, Peoples stated that he did not know who had gotten into the car. But he conceded at trial that he may have told police that he had seen

Harris get in the car, and that he had heard gunshots. After hearing the gunshots, Peoples had seen Harris and Bennie leaving the parking lot. Peoples stated that he may have told police officers that he had seen a gun in Harris's hand, and that he had known Harris to carry a .45–caliber gun.

{¶ 10} Police officer David Landesberg identified photographs that he had taken at the scene of the shooting. According to Landesberg, police officers had recovered $210 that had been found under Gulleman's left leg. Landesberg also testified that a pellet gun had been found under the passenger seat of Gulleman's car. When asked about the gun by Harris's counsel, Landesberg stated that it looked like a real firearm, and that it had been completely concealed under the passenger seat.

{¶ 11} Police sergeant Jeff Hunt testified that he had been dispatched to arrest Harris for suspicion of Gulleman's murder. Hunt stated that Harris's cellular telephone had been recovered from one of his pockets and that a bag of bullets had been recovered from the apartment where Harris had been found. According to Hunt, the bullets in the bag appeared to be .45–caliber bullets.

{¶ 12} Over the objection of defense counsel, Dr. Carla Dreyer, a psychologist, testified that Harris had been referred to the court clinic by the trial court for an evaluation of his competency to stand trial and for a determination of whether he had been legally insane at the time of the shooting. Dreyer testified that Harris was competent to stand trial and that he did not meet the criteria for a not-guilty-by-reason-of-insanity plea. Dreyer testified that in her opinion, Harris "was malingering both cognitive and psychiatric difficulties." Dreyer explained that malingering meant "feigning or exaggerating, so basically making up or exaggerating already existing symptoms to seem worse than they are."

{¶ 13} Gary Brown testified that he had been in the Hamilton County Justice Center while Harris and Bennie were held there. According to Brown, Harris had told him that "[Gulleman] had that roll on him and he act like he didn't want to give it up." Brown stated that, to him, that meant, "like if someone is robbing you, you hesitating to, you know, give up what they ask for." Brown testified that Harris had stated that a woman had "rolled over on him," and that Harris had said he would "blam" her. The assistant prosecutor then asked, "Did [Harris] make any statement about what he had done to the guy that wouldn't give him the roll?" And Brown replied, "He said he blammed him, but he didn't go off into detail about where he shot him at or what he shot him with, or—he didn't go on off into that. But blam, blam basically means shoot, shoot someone."

{¶ 14} Tobias Johnson and Harris were housed in the same pod in the justice center. Johnson testified that Harris had discussed his case with him and had told Johnson that he planned to act like he was crazy to try to avoid the charges against him. According to Johnson, Harris had told him two versions of what had happened the night that Gulleman was shot. In the first story, Harris stated that

another person, who went by the nickname "B," was going to sell Gulleman some heroin. B had run out of heroin, so Harris had lied and said he had Oxycontin and arranged to meet Gulleman. According to Johnson, Harris had gone to the parking lot to rob Gulleman. Johnson stated that Harris had told him that when he had pointed a gun at Gulleman, Gulleman had begun to cry and had said that he had planned on robbing Harris. Harris had then gotten out of the car and shot Gulleman as Harris was exiting from the car. In the second version of the story that Harris allegedly told Johnson, Harris had gone to the parking lot to rob Gulleman. There was no mention of Gulleman having stated that he had also planned to rob Harris.

{¶ 15} Antonio Gray had also met Harris in the justice center. According to Gray, Harris had told him that he was going to plead insanity first, and if that did not work, he was going to say that he had not been there when the shooting happened. Gray also testified that Harris had told him about the shooting: "And it was supposed to be, you know I guess a robbery because he was supposed to have 85 Oxycontin pills, Mr. Harris did, and he was going to rob, you know Mr. Gulleman. But it did not go as planned because Mr. Gulleman didn't want to give up the money." According to Gray, Harris told him that because Gulleman had not given him the money, Harris had shot him.

{¶ 16} Derrell Anderson testified that he had met Harris in the justice center. According to Anderson, Harris had told him "that a murder happened in the first right court on Craft Street, that he was robbing the guy. It was the guy that came down there to meet somebody else for some drugs. And he went and instead of giving him the drugs he robbed the guy."

{¶ 17} Harris took the stand in his own defense. Harris testified that on September 25, he had gone to the parking lot to sell Gulleman some Oxycontin. According to Harris, Gulleman had started to hesitate before paying for the pills. Harris testified that

> [Gulleman] said something, he left something in the back. So I am like—I am already watching it, because I know how a lick will do as you pull off or they'll either come and rob a person late night or do anything, so I am already like watching him, what he's doing. So I am looking back. The whole time his body is turned towards the back seat and he was doing something under the seat, so I looked back. I'm like, what you doing, man? He just kept hesitating and trying to take my attention off of him giving me the money, because I had the pills already to sell him. So I look back and I see what he was grabbing, and I just—I got out. I ran, I started shooting.

Harris claimed that he had seen what he believed to be a real gun in Gulleman's backseat.

. . .

9

{¶ 36} The fifth assignment of error is that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. Harris also asserts that the trial court erred when it denied his Crim. R. 29 motion for an acquittal.

{¶ 37} The standard of review for a sufficiency claim and for the denial of a Crim. R. 29 motion for an acquittal is the same. When an appellant challenges the sufficiency of the evidence, we must determine whether the state presented adequate evidence on each element of the offense. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). On the other hand, when reviewing whether a judgment is against the manifest weight of the evidence, we must determine whether the jury clearly lost its way and created a manifest miscarriage of justice. *Id.* at 387. Because we are reversing Harris's convictions for aggravated murder and aggravated robbery, we need not consider whether those convictions were against the manifest weight of the evidence.

{¶ 38} Harris was convicted of aggravated murder in violation of R.C. 2903.01(B), which provides that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery, [or] robbery." He was also convicted of aggravated robbery in violation of R.C. 2911.01(A)(1).

{¶ 39} Harris admitted that he had shot Gulleman. But during trial he denied that he had tried to rob Gulleman. He now contends that the state did not present sufficient evidence of a robbery or attempted robbery. We disagree. State witnesses testified that Harris had told them that he had intended to rob Gulleman. The jury was in the best position to determine the credibility of those witnesses. Further, that Gulleman was found with $210 under his body and that his wallet was still in the car after the shooting does not negate the circumstantial evidence that Harris had attempted to rob Gulleman before shooting him. We conclude that the state presented sufficient evidence of aggravated murder, aggravated robbery, and having weapons while under disability. And the jury did not lose its way when it found Harris guilty of having weapons while under a disability. The fifth assignment of error is overruled.

(Doc. 1, Ex. 4, PageID 3–8, 14–16).

After review of the record in this case, the undersigned finds that petitioner is not entitled to habeas relief based upon his sufficiency of evidence claim. The clearly-established standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). As

10

the Supreme Court held in *Jackson,* because the Due Process Clause requires the State to prove

beyond a reasonable doubt every fact necessary to constitute the charged offense, *In Re Winship,*

397 U.S. 358, 363–64 (1970), "the relevant question" in assessing the sufficiency of the evidence

"is whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the State is not required to rule out every hypothesis except

that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced

with a record of historical facts that supports conflicting inferences must presume—even if it

does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in

favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703

F.2d 959, 969–70 (6th Cir. 1983). It is the responsibility of the trier of fact to resolve conflicts in

testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,*

443 U.S. at 319. Consequently, the reviewing court is not permitted to reweigh the evidence,

reevaluate the credibility of witnesses, make its own subjective determination of guilt or

innocence, or otherwise substitute its opinion for that of the jury. *See id.* at 318–19 & n.13; *see*

*also United States v. Fisher,* 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh,* 567

F.3d 191, 205 (6th Cir. 2009)); *York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v.*

*Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th

Cir. 2000)); *see also Fisher*, 648 F.3d at 450. Due process is satisfied as long as such evidence is

enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a

reasonable *speculation* that the petitioner is guilty of the charged crime. *Newman,* 543 F.3d at

796–97 (and Sixth Circuit cases cited therein).

Moreover, federal habeas review of a claim challenging the sufficiency of the evidence is even further limited. As the Sixth Circuit explained in *Brown*, 567 F.3d at 205, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011), *cert. denied*, 132 S.Ct. 1927 (2012); *Anderson v. Trombley*, 451 F. App'x 469, 474-75 (6th Cir. 2011). Therefore, as the Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner . . . is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

*Brown,* 567 F.3d at 205 (emphasis in original).

Applying the double-layer deferential standard to the case-at-hand, the undersigned is convinced that the Ohio Court of Appeals' sufficiency determination is neither contrary to nor an unreasonable application of *Jackson*. In order to carry its burden of proof on petitioner's aggravated robbery conviction, the prosecution was required to prove that petitioner, in attempting or committing a theft offense or fleeing immediately after the attempt or offense, had a deadly weapon on or about his person and displayed, brandished, indicated possession of, or used the deadly weapon. Ohio Rev. Code § 2901.11(A). In order to sustain his aggravated murder conviction, the prosecution had to prove that petitioner purposely caused the death of

another while committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated robbery.  Ohio Rev. Code § 2903.01(B).

In this case, petitioner claims that there was not legally sufficient evidence to prove that he committed or attempted to commit a robbery for purposes of the aggravated robbery and aggravated murder convictions.  However, as noted above, Gary Brown, Tobias Johnson, Antonio Gray, and Derrell Anderson all testified as to comments made by petitioner while incarcerated at the Hamilton County Justice Center (HCJC) regarding his robbing Gulleman. Brown testified that petitioner told him that Gulleman had a large sum of money on him and that when he refused to "give it up," petitioner shot him.  (Doc. 3, Transcript at PageID 1196). Johnson similarly testified that petitioner told him that he got money by telling drug users that he had Oxycontin pills for sale and then robbing them.  He further stated that petitioner told him that he met with Gulleman in order to rob him.  (*Id.* at 1266, 1271).  According to Gray, petitioner also told him that he intended to rob Gulleman and petitioner shot him because he did not give him the money.  (*Id.* at 1300).  Finally, Anderson testified that petitioner said he robbed a guy looking for drugs and that he shot him.  (*Id.* at 1387–88).

In sum, not one, but four witnesses provided uniform testimony that petitioner intended to rob Gulleman and shot him in the process.  Based on this evidence the Ohio Court of Appeals reasonably determined that the prosecution offered sufficient evidence to establish the robbery element underlying both convictions.  Although petitioner testified that he did not intend to rob Gulleman and that the incident was simply a drug-deal gone bad, the appeals court correctly noted that the jury is in the best position to determine the credibility of the witnesses at trial. Similarly, although petitioner argues that jailhouse informants receiving case consideration are inherently untrustworthy, it is not the province of this court to assess the credibility of witnesses

13

or to reweigh the evidence on habeas review.  *See Matthews v. Abramajtys,* 319 F.3d 780, 788 (6th Cir. 2003) (noting that a habeas court "does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court").

Nevertheless, petitioner maintains that insufficient evidence was presented at trial to establish that he intended to commit or attempted a robbery, as he claims the only evidence admitted in this regard were his extra-judicial statements.  For support petitioner relies on the Supreme Court's decision in *Opper v. United States*, 348 U.S. 84 (1954).  The rule announced in *Opper*—the so-called corroboration rule—is that "a defendant cannot be convicted based solely on her uncorroborated statements or confessions."  *United States v. Ramirez*, 635 F.3d 249, 256 (6th Cir. 2011) (citing *Smith v. United* States, 348 U.S. 147, 153–54 (1954); *Opper*, 348 U.S. at 89, 93).  The government generally satisfies the rule upon introducing "substantial independent evidence which would tend to establish the trustworthiness of the statement."  *Opper*, 348 U.S. at 93.  However, the independent corroborating evidence does not need to itself prove the offense beyond a reasonable doubt or even prove each element of the offense.  *United States v. Brown*, 617 F.3d 857, 862 (citing *Smith*, 348 U.S. at 156; *United States v. Trombley*, 733 F.2d 35, 37 (6th Cir. 1984)).  "Rather, the purpose of the corroboration is merely to ensure the reliability of the confession or admission of the accused."  *Brown*, 617 F.3d at 862 (quotation marks and citation omitted).  "So long as portions of the defendant's statements are corroborated by 'substantial independent evidence' that 'tend[s] to establish the trustworthiness of the statement,' then the elements of the crime may be established by the defendant's statements."  *Ramirez*, 635 F.3d 257 (quoting *Opper*, 348 U.S. at 93).  In determining whether a statement is sufficiently corroborated the Court views the evidence in light most favorable to the government.  *Id.* (citing *United States v. Pennell*, 737 F.2d 521, 537 (6th Cir. 1984)).

14

After careful review of the record in this case, the undersigned finds that petitioner's extra-judicial comments were sufficiently corroborated by independent evidence.  First, the HCJC witnesses' testimony that petitioner stated that he shot Gulleman after he would not give petitioner his money is corroborated by the independent evidence that Gulleman was found shot to death in his car with $210 dollars concealed under his leg.  (*See e.g.*, Doc. 3, Transcript at PageID 947–48).

In addition, Khristina Willis testified that shortly before the Gulleman shooting she observed petitioner committing a separate robbery, by pulling a gun on several individuals and asking "where the money and weed at?"  (Doc. 3, Transcript at PageID 698, 700, 709).  Viewed in the light most favorable to the prosecution, Willis's testimony provides independent corroboration for petitioner's comment to Johnson that robbing drug users is how he made his money.  (*See id.* at 1266).

Other independent testimony lends support to the truthfulness of petitioner's statements to the HCJC witnesses.  With regard to the shooting, Johnson and Anderson both testified that petitioner told them that he shot Gulleman several times with a "45 automatic."  (*Id.* at 1270–71, 1388).  Independent testimony at trial revealed that the victim was in fact shot eight to nine times with a .45 caliber weapon—a fact that was not publicly disclosed during the course of the investigation.  (*Id.* at 796, 1310–12).  Petitioner also told Gray that he changed the SIM card in his cell phone several times because he knew he was the last person to text Gulleman before the shooting.  (*Id.* at 1301).  Detective Tim Gormly's testimony confirmed that the telephone records showed that petitioner was texting with Gulleman just prior to his death and that petitioner used four different SIM cards around the time of the shooting.  (*Id.* at 1301, 1343).  Finally, Johnson's testimony that petitioner told him that he saw a toy gun in Gulleman's car (*id.* at 1270) was

15

bolstered by petitioner's own trial testimony that he shot Gulleman after he allegedly reached for a fake gun.  (*Id.* at 1424–25).

Viewing the record in the light most favorable to the prosecution, the undersigned finds sufficient independent corroborating evidence that tends to establish the trustworthiness of petitioner's statements to the HCJC witnesses.  Therefore, the Ohio Court of Appeals properly considered petitioner's statements in determining that petitioner's convictions for aggravated robbery and aggravated murder were supported by sufficient evidence.  Taking into consideration the testimony of the HCJC witnesses—who unanimously testified that petitioner said he robbed Gulleman—the Ohio Court of Appeals reasonably determined that the prosecution offered sufficient evidence to prove that petitioner committed or attempted to commit a robbery.  The Ohio Court of Appeals' adjudication of petitioner's sufficiency of evidence claim involved a reasonable application of the *Jackson* standard and was based on a reasonable determination of the facts in light of the evidence presented at trial.  Furthermore, because petitioner's aggravated robbery and aggravated murder convictions were supported by sufficient evidence, his retrial on these charges does not present a double jeopardy violation.

Accordingly, in sum, the undersigned concludes that petitioner is not entitled to habeas relief.  Having found that petitioner's sufficiency of evidence claim is without merit, petitioner's double jeopardy claim is also without merit. [1]

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the claims alleged in the

---

[1] Petitioner has requested oral argument on the issues presented in the habeas petition.  (Doc. 6, PageID 1698–99).  However, for the reasons stated herein, the Court finds a hearing unnecessary to resolve the petition.

petition, which have been addressed on the merits herein, because petitioner has not stated a

"viable claim of the denial of a constitutional right," nor are the issues presented "adequate to

deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000)

(citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)). *See also* 28 U.S.C. § 2253(c); Fed.

R. App. P. 22(b).

    3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,*

the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting

this Report and Recommendation would not be taken in "good faith," and, therefore, should

**DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See*

Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).


Date: <u>May 13, 2015</u>                  <u>s/ Karen L. Litkovitz</u>
                                               Karen L. Litkovitz
                                               United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JOSEPH HARRIS,                                      Case No. 1:15-cv-189
      Petitioner,

                                        Black, J.
      vs.                                          Litkovitz, M.J.

HAMILTON COUNTY
SHERIFF, et al.,
      Respondents.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).